*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 04-135-P-H* |
| | ) | |
| *RYAN P. HOPKINS,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Ryan P. Hopkins, charged with one count of possession of a sawed-off shotgun in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d) and 5871, one count of possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of being a drug user in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2), seeks to suppress statements that he asserts were elicited in violation of the protections of *Miranda v. Arizona*, 384 U.S. 436 (1966).[1] *See* Indictment (Docket No. 1); Defense Motion To Suppress Statements, etc. ("Motion") (Docket No. 18).[2] An evidentiary hearing was held before me on March 31, 2005 at which the defendant appeared with counsel and at the conclusion of which counsel for both the defendant and the government argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

---

[1] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

[2] Shawn D. Hopkins, Ryan Hopkins' co-defendant, had also filed a motion to suppress statements he made. *See* Motion To Suppress Statements (Docket No. 17). However, at the start of the hearing held on March 31, 2005, counsel for Shawn Hopkins stated that his client was withdrawing that motion. To avoid confusion, I henceforth refer to Ryan Hopkins as "Ryan" and Shawn Hopkins as "Shawn."

### I.  Proposed Findings of Fact

On May 22, 2004 the Maine State Police ("MSP") Tactical, or "SWAT," Team arrested brothers Shawn and Ryan Hopkins alongside the Maine Turnpike in Cumberland, Maine.  Shawn and Ryan both were arrested on material-witness warrants in connection with the murder of Julius Petrovic in Yarmouth, Maine on May 17, 2004.  Shawn was arrested, in addition, on a probation-violation charge, and Ryan was arrested, in addition, on a charge of failure to appear in court in connection with an operating-after-suspension ("OAS") charge.  In the course of the arrest, both Shawn and Ryan were pulled from their vehicle and placed on the ground.

Following their arrest, Shawn and Ryan were taken to the Cumberland County Jail ("CCJ"). MSP Detective Angela Blodgett, the primary detective in the Petrovic murder investigation, and MSP Detective Scott Harakles interviewed Ryan in a room in the CCJ intake area. *See* Gov't Exh. 1A.  At that time, Blodgett was aware from various interviews that Shawn and Ryan were drug users, and she assumed they currently were using drugs.  She also had obtained evidence linking the brothers to the Petrovic murder and considered them suspects in that case.  Blodgett does not, herself, conduct drug investigations.  If a case involves drugs, she contacts either the Maine Drug Enforcement Agency or the federal Drug Enforcement Agency.  Ryan was not charged with any state drug offenses.

According to a transcript of the interview, which commenced at 9:25 p.m., Blodgett read Ryan his *Miranda* rights, and he stated that he understood them.  *See id*. at 1-2.  He then told the detectives that he did not wish to talk to them at that time and wanted to consult with a lawyer because he was not feeling well and did not understand completely what was going on.  *See id*. at 2-3.  Harakles left to get a correction officer to escort Ryan back to his cell.  *See id*. at 3.  In that interval Blodgett asked Ryan several questions that she told him were biographical, all of which he answered.  *See id*. at 4-6. In addition to inquiring about Ryan's date of birth, employment status, most recent address, Social

Security number, probation status and the name and location of his probation officer, Blodgett asked

the following:

> AB   And, RYAN, do you have any medical conditions that I should let them know about?  Ah, any medications or medical problems that you're having right now?
>
> RH   Yeah, I think they're aware of my medical problems right now.
>
> AB   Okay.  All right.
>
> RH   Yeah, I, hopefully, they'll (inaudible)
>
> AB   Okay.  Don't hesitate to speak up if, um, if you're not feeling well and let them know that . . .
>
> RH   Right.  Right.  Yeah.  They've been more than . . .
>
> AB   Okay.
>
> RH   More than helpful.
>
> AB   Good.
>
> RH   Kind and . . .

*Id*. at 4-5.  The interview terminated at 9:28 p.m.  *See id*. at 1.  Although Blodgett has a form she

typically uses to ask questions of this nature, she did not recall following it during her interview with

Ryan.  However, it is her practice to ask biographical questions of MSP arrestees who are brought to

the jail.  She then completes a sheet for CCJ personnel that contains biographical information, the

charges against the arrestee and  sometimes a short narrative explaining why the person is being

brought to the jail.  Blodgett was aware of the circumstances of Shawn's and Ryan's arrest and was

interested in ascertaining whether they had been injured during that process or otherwise needed

medical attention.

　　　　When Blodgett finished her interview with Ryan, she interviewed Shawn.  She then returned to

3

her office in Gray, Maine.  While *en route*, she received a phone call from Ryan and placed him on hold until she could get to her desk.  She took the call, and Ryan asked her when discovery would be available.  She has not conversed with him since.

That Monday, May 24, Ryan met with CCJ Classification Officer Barbara Seely, whose job it was to classify inmates into security levels (normal, medium or maximum) and pods.  Seely, who wore a guard uniform, met with inmates in their pods or in a classroom.  She met on Monday mornings with inmates who had been arrested over the weekend.  Her practice was to read questions verbatim from a form and write down whatever the inmate said in response.  She did not read inmates *Miranda* warnings.  The inmate whom she was interviewing typically would be sitting alongside or across from her.  At the end of the interview both she and the inmate would sign the form she had just completed.  She would then return to her office and score the form, using it to help determine where in the facility to house the inmate and programs for which the inmate might qualify.

Seely had no independent memory of her interview with Ryan.  However, the form she completed, which was admitted into evidence without objection, indicates that Ryan's status was "PA" and "PT," which Seely explained meant "pre-arrangement" and "pre-trial," and that the charges then pending against him were "Material Witness" and "Port. D/C FTA OAS," the latter meaning failure to appear in District Court in Portland for OAS charges.  *See* Gov't Exh. 3.  The form contains six categories of questions, titled (i) prior criminal history, (ii) pending criminal charges, (iii) escape risk, (iv) chemical dependency/mental health, (v) community ties and (vi) housing program referrals.  *See id*.  Questions asked under the heading of chemical dependency/mental health include: "Do you use drugs?  Describe usage and type[.]"  *Id*. at [1].  Seely wrote "yes" to the question whether Ryan used drugs, and "Heroin – every day – several times" to describe the usage and type.  *Id*.  Both Ryan and Seely signed the form.  *See id*. at [2].  No attorney was present when Seeley conducted her

4

interview with Ryan.

## II.  Discussion

If a suspect unambiguously invokes his *Miranda* rights, "he is not subject to further interrogation by the authorities . . . unless the accused himself initiates further communication, exchanges, or conversations with the police."  *James v. Marshall*, 322 F.3d 103, 108 (1st Cir. 2003) (citation and internal quotation marks omitted).  Ryan contends, in essence, that the authorities (in the persons of MSP Detective Blodgett and CCJ Classification Officer Seely) impermissibly subjected him to further interrogation in the face of his unambiguous invocation of his rights to remain silent and to have counsel present during any further questioning.  In issue are responses elicited by Blodgett and Seely concerning drug usage that bear on the current federal charge of being a drug user in possession of a firearm.

The government counters that Blodgett's and Seely's questions cannot fairly be categorized as "interrogation," but rather fit within the confines of the so-called "routine booking exception" to the *Miranda* rule.  *See* Government's Objection to Defendants' Motion To Suppress (Docket No. 20) at 4-7.  I agree.

The booking exception "exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation and internal quotation marks omitted).  However, there is an exception to the exception: It does not apply "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate."  *United States v. Reyes*, 225 F.3d 71, 76 (1st Cir. 2000) (citation and internal quotation marks omitted).  Although this inquiry is "phrased in terms of the officer's intention," it is "actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an

5

incriminating response." *Id*. at 76-77.

As defense counsel acknowledged at hearing, the First Circuit had occasion to construe the booking exception in *Reyes* and *United States v. Doe*, 878 F.2d 1546 (1st Cir. 1989).  In *Reyes*, an Immigration and Naturalization Service ("INS") agent assigned to work with the Drug Enforcement Administration ("DEA") questioned the defendant for purposes of booking him following his arrest on a charge of participating in a criminal drug conspiracy.  *See Reyes*, 225 F.3d at 74.  The INS agent advised the defendant of his *Miranda* rights but did not seek a waiver of those rights prior to requesting his name, date of birth and Social Security number.  *See id*.  Although the drug-conspiracy charge against the defendant was dropped, he ultimately was charged with making false statements in violation of 18 U.S.C. § 1001 based on an allegedly false name, date of birth and Social Security number given in response to the booking questions.  *See id*. at 75.

The First Circuit held that the booking exception applied, rendering the statements admissible, inasmuch as (i) the INS agent asked only those questions found on the standard DEA booking form, with no reference to the charge on which the defendant was being booked, (ii) the booking interview was conducted separate from any substantive interrogation, which was performed by a different officer in a different room at a different time, and (iii) it was not reasonably foreseeable that the questions would elicit an incriminating response inasmuch as they bore no direct relevance to the charge of criminal drug conspiracy on which the defendant was being booked.  *See id*. at 77.  The First Circuit observed:

> [W]e think that it would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*.  We can imagine situations, of course, that would present a closer case than this one.  For example, asking a person's name might reasonably be expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense focused on identity; likewise, asking an individual's date of birth might be expected to elicit an incriminating response if the

6

individual were in custody on charges of underage drinking; and questions about an individual's Social Security number might be likely to elicit an incriminating response where the person is charged with Social Security fraud. In such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned.

*Id*.

In *Doe*, by contrast, the First Circuit held that the booking exception did not apply. *See Doe*, 878 F.2d at 1550-52. In that case, Coast Guard officers aboard a U.S. Navy destroyer sought to board a British-registered sailboat in the Caribbean. *See id*. at 1548. The sailboat maneuvered dangerously close to the destroyer, caught fire and sank, whereupon several bales of marijuana rose to the surface. *See id*. The Coast Guard rescued and arrested the sailboat's occupants. *See id*. Prior to administering any *Miranda* warning, the Coast Guard asked the defendants their names and citizenship. *See id*. at 1550. They stated that they were American citizens. *See id*. The defendants ultimately were charged, *inter alia*, with violation of a statute making it an offense for any United States citizen on board any vessel to possess drugs with intent to distribute them. *See id*. The First Circuit observed:

> [T]he administrative need for initial background questioning seems less great here than typically present at a police station, where one officer may book a suspect in one room before another questions the suspect at greater length elsewhere. Here, the same officer asked the identification questions as the substantive questions, and the record suggests that he could easily have offered a *Miranda* warning before asking about citizenship. For another thing, questions about citizenship, asked on the high seas, of a person present on a *foreign* vessel with drugs aboard, would (in our view) seem reasonably likely to elicit an incriminating response. When, or whether, the United States can prosecute a person found on such a ship is not immediately obvious; and the possibility that prosecution will turn upon citizenship is great enough (and should be well enough known to those in the drug enforcement world) that Coast Guard officers ought to know that answers to such questions may incriminate.

*Id*. at 1551-52 (citation and internal quotation marks omitted) (emphasis in original).

At hearing defense counsel posited, as an initial matter, that the Blodgett and Seely questioning

7

in this case is materially distinguishable from that in the *Reyes* and *Doe* cases in that Ryan invoked his rights to counsel and to remain silent.  However, I fail to see how that distinction has any bearing on the question whether the booking exception applies.  The issue presented in  *Reyes*, *Doe* and this case is whether questions asked in purported violation of *Miranda* constitute a permissible routine booking interview or an impermissible custodial interrogation.  The focus is not on how the transgression allegedly occurred – *e.g*., as the result of an absence of any *Miranda* warnings (as in *Doe*) or an absence of a valid *Miranda* waiver following warnings (as in *Reyes*) – but rather on the nature of the questions asked.  *See, e.g., United States v. Foster*, 227 F.3d 1096, 1102-03 (9th Cir. 2000) (noting that officers permissibly may ask routine booking questions even after a suspect invokes right to counsel); *United States v. Mitchell*, 58 Fed. Appx. 14, 16 (4th Cir. 2003) (noting, in context in which defendant had invoked right to counsel, that "[q]uestions normally attendant to arrest and custody do not constitute interrogation for *Miranda* purposes"); *United States v. Granero*, Nos. CRIM.91-578-1, CIV.94-5040, 1995 WL 394140, at *7 (E.D. Pa. June 30, 1995) (noting that routine booking questions "may be asked of a suspect who has invoked the right to remain silent without violating his or her constitutional rights").

Defense counsel also pointed out that, with respect to Blodgett's interview, Blodgett did not follow a preprinted form and was the same officer who attempted to ask substantive questions at the same place and time.  He further argued that, in this case, there was a link between the questions and the allegations.  He conceded that, in Maine, there is no state statute criminalizing possession of a weapon by a drug user.  However, he  contended that inasmuch as (i) Blodgett knew that Ryan reportedly was a significant drug user, and (ii) there was speculation that the Petrovic killing involved an attempt to get money to buy drugs, Blodgett should have known that a question dealing with medical issues was likely to elicit an incriminating answer regarding drug usage.

8

While it is true that Blodgett (i) did not follow a preprinted form, (ii) was indeed the same officer who had attempted to ask substantive questions at the same time and place, and (iii) suspected that Ryan was a drug user and had been involved in the Petrovic murder, I find that the government carries its burden of demonstrating that this portion of her interview with Ryan constituted routine booking questioning, not interrogation. As an initial matter, Blodgett testified that it was her practice to ask biographical questions of MSP detainees who were brought to the CCJ for purposes of completing standard paperwork. Further, as counsel for the government argued at hearing, the MSP and the CCJ had an obligation to attend to any medical needs Ryan may have had. In the circumstances, Blodgett's inquiry whether he had any medical conditions about which the CCJ should know was a reasonable sort of screening question: Apart from his suspected drug usage, he had that day, as Blodgett knew, been forcibly taken from his vehicle and placed on the ground incident to his arrest by the MSP SWAT Team. *See, e.g., United States v. Bishop*, 66 F.3d 569, 572 n.2 (3d Cir. 1995) ("[T]he district court did not commit clear error in finding that the police officer's question about Stokes' limp was part of the booking procedure designed to fulfill the government's obligation to provide medical attention if necessary.").

Finally, and most importantly, I am unpersuaded that Blodgett reasonably should have known that her facially neutral question, inquiring whether Ryan had any medical condition of which jail personnel should be aware, would likely elicit an incriminating response. Tellingly, her question did not actually elicit such a response: Ryan said nothing at all about the Petrovic murder, firearm possession or his drug usage, merely stating that jail personnel already were aware of his medical problems. In any event, Blodgett had no reason to know that her question might elicit an answer that would be incriminating for purposes of the current federal charge. She was not concerned with, and did not handle, drug violations, and Maine does not have a parallel state law criminalizing possession

9

of a weapon by a drug user.  Thus, this case more closely resembles *Reyes* (in which the defendant was being booked on charges that bore no direct relevance to the booking questions asked) than *Doe* (in which the Coast Guard reasonably should have foreseen that its pointed question regarding citizenship would bear on the government's ability to prosecute the defendants, who were aboard a foreign vessel, in connection with their apparent drug dealing).

Turning to the Seely interview, defense counsel argued at hearing that the routine booking exception was inapplicable inasmuch as there is no such thing as a "classification exception."  The argument is without merit.  The Supreme Court in *Muniz* described the booking exception as pertaining not only to questions asked to complete booking but also to those asked "to complete pretrial services."  *Muniz*, 496 U.S. at 601  (citation and internal quotation marks omitted).  My research reveals no case holding that classification questions cannot, as a matter of law, fall within the booking exception.  Instead, courts appear to have assumed that the booking-exception analysis applies in such situations.  *See, e.g., United States v. Webb*, 755 F.2d 382, 386, 388-89 (5th Cir. 1985) (analyzing whether classification officer's question met booking exception; concluding it did not inasmuch as, *inter alia*, question deviated from standard script and was reasonably likely to elicit incriminating response given charges officer knew were pending against defendant); *Nika v. State*, 951 P.2d 1047, 1056-57 (Nev. 1997), *overruled on other grounds*, 59 P.3d 440 (Nev. 2002) (analyzing whether classification questions met booking exception; concluding that they did inasmuch as, *inter alia*, classification officer followed standard script and safety of prisoners was purpose of questioning).

In this case, I am persuaded that the Seely interview fits the confines of the booking exception. Seely performed a routine classification interview in the manner, at the time and in the setting in which she typically conducted such interviews.  There is no evidence that she knew anything about Ryan other than what was disclosed on her interview form – that he was arrested as a material witness

10

and for failure to appear in court on OAS charges.  She asked Ryan exactly the same questions she asked all detainees, reading verbatim from a preprinted form.  Although the CCJ's standardized questions concerning drug usage were pointed, defense counsel does not argue that they served no legitimate jail-related administrative purpose.  Plainly, for purposes of both discouraging contraband traffic in jail and attending to detainees' medical needs, jailors would find such information useful – even arguably essential.  Finally, while one certainly could posit circumstances in which a classification officer would have reason to know that pointed questions such as these would likely elicit incriminating answers, that is not the case here.  From all that appears, Seely had no reason to expect that Ryan would answer in the affirmative or that any affirmative response would prove incriminating with respect to the state charges on which he had been booked, let alone the federal charges later lodged against him.  For all of these reasons, and although I am unable to find any case considering whether a pointed question regarding drug usage can be subsumed under the booking exception, I am persuaded that the Seely interview properly is classified as routine booking, rather than as custodial interrogation, pursuant to the teachings of *Reyes* and *Doe*.

### III.  Conclusion

For the foregoing reasons, I recommend that defendant Ryan Hopkins' motion to suppress evidence be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

***Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.***

Dated this 5th day of April, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

12